## GEORGE R. GAITHER *vs.* JOSEPH MYRICK.

The principles which regulate the conduct of factors abroad apply to supercargoes: they are liable for injuries to the employer, occasioned by the want of reasonable skill or ordinary diligence.

By reasonable skill is understood such skill, and no more than, is ordinarily possessed and employed by persons of common capacity engaged in the same trade, and by ordinary diligence that degree which persons of common prudence are accustomed to use about their own business.

Supercargoes are also bound to good faith, and must exercise their judgment after proper inquiries and precautions, and, where they have a venture in the same ship, they must exercise as much diligence and care about their factorage transactions as about their private concerns.

They are chargeable for negligence if they sell without making proper inquiry, after having received notice of facts which ought to put a person of prudence on his guard.

As a general rule they cannot delegate their authority, but exceptions may arise where the power of delegation is conferred by the necessity of the case, the usages of trade, or the law and custom of the country where the agency is to be executed.

Where the master of the ship is consignee of the cargo, his duties and liabilities are as distinct as if confided to different persons.

It is the duty of the ship to carry the cargo according to the projected voyage, and this must be done by every reasonable and practicable method; every act not properly and strictly in furtherance of this duty will make the master and owners responsible.

In some cases a sale of the cargo and ship may be justified, but the *necessity* of the case must require that course; in such case the master is to do that which a wise and prudent man will think most conducive to the interest of *all concerned;* some regard may be allowed to the interest of the owners of the ship, but that of the *cargo* must not be sacrificed to it.

Transhipment for the place of destination, if practicable, is the first object, if that be impracticable, a return or safe deposit may be made; the merchant should be consulted, if possible: a *sale* can only be justified by that necessity which supersedes all human laws, and if the master sell without such necessity, he and his owners will be answerable to the merchant.

The words, "to Valparaiso and a market," in a contract of affreightment, authorise the ship to visit such other ports beyond the named port as the master and supercargo thinks expedient in the exercise of a *sound discretion*.

These words also imposed on the ship the carriage of the cargo until a market was found, or the goods left on deposit for sale under circumstances authorising such a departure from the original contract.

Under this contract the master and supercargo was not bound to sell at the first or any other port, if he had reason to believe that he could find a better market by going further, and acted in good faith.

A prayer which submits to the jury the finding of facts of which there is no sufficient evidence, is erroneous.

The presumption of law is, that an agent has done his duty until the contrary appears; misconduct and negligence will not, in the absence of proof, be presumed.

If a master, who is also part owner and supercargo, sells the vessel before the cargo is landed, and then lands it before a sale was effected or storage obtained for it, in order to deliver the vessel in compliance with his contract of sale, and the cargo is injured by such landing and exposure, he is responsible to the shipper for the loss resulting therefrom.

The power to sell is subordinate to the claim of the cargo to be carried and delivered according to the projected voyage, and the fact that the shipper knew that the vessel might possibly be sold cannot affect his claim for damages incurred by the sale.

The shipper cannot recover for an act of the master subjecting the cargo merely to the *risk* of being taken and destroyed under the local laws of the port of discharge, in the absence of proof that it was so taken, or that any loss to the cargo resulted therefrom.

Where the cargo is landed before sale and before the termination of the voyage, and is reshipped to the place of destination, the shipper is not liable for the charges of landing and reshipment; it lies on the master to excuse himself for such act.

Where the consignee is master, and this is known to the shipper, he cannot wholly abandon his duty as master to discharge that of supercargo; he must act in both, as far as possible, with reference to the interest of the respective principals.

If such a consignee abandons or delegates his trust to another, merely because the cargo could not be disposed of at one of the ports reached prior to the termination of the voyage, it is a violation of duty for which he is responsible.

But if another party, wrongfully and without his privity, assumes authority to sell, and does sell the cargo, the consignee will not be responsible.

APPEAL from the Superior Court of Baltimore city.

*Assumpsit*, by the appellant against the appellee, to recover damages for losses on the sale of flour shipped by the plaintiff on board the ship "Seaman," on a voyage from Baltimore to Valparaiso and a market, alleged to have been occasioned through the negligence and misconduct of the defendant, who was part owner and master of the ship, and consignee of the flour.  Plea, *non assumpsit*, with an agreement to waive all errors in pleading, and that either party might give in evidence any matter which would be admissible under any state of pleadings, and that the plaintiff should file a brief statement of the grounds of his claim.  This statement sets forth that the plaintiff was owner of two hundred barrels, parcel of a lot of flour, shipped through his agents, Wysham & Sons, in April 1849, on board the above named ship for Valparaiso and a market.  The grounds of claim against the defendant are:

1st. *As part owner and master of the vessel:* for neglect and want of care of the flour during the continuance of the contract of affreightment.

2nd. *As part owner and master:* for improper delivery of the flour on the mole at Lima, and for want of care and attention for its protection, afterwards, from injury, it being left, as alleged, on the mole, exposed to the action of the sun and of the spray of the sea washing against the mole.

3rd. *As consignee of the flour:* in various respects:—1st, for receipt as consignee of the flour at an improper place; 2nd, for want of care after its receipt; 3rd, for neglect of due and becoming efforts to sell it at the earliest practicable period and for the best attainable price; 4th, for remissness in not enforcing compliance by the purchaser with a sale of the flour at $8 per barrel; 5th, for leaving the flour at Lima, or some other place, unsold when he left that country; 6th, for placing the flour, without authority, and in violation of his duty and

Gaither *vs.* Myrick.

undertaking as consignee, in the hands of some other person; 7th, for omitting to invest the proceeds, as instructed, in a return cargo.

*Exception.* The proof, so far as necessary to be stated, is briefly as follows: The ship "Seaman" cleared at Baltimore the latter part of April 1849, for the west coast of South America, Callao being the port named as her destination. Part of her cargo was flour of various brands. The defendant was master, consignee of the entire cargo, part owner, and interested in a shipment of four hundred barrels of flour of the "Harper's Ferry" brand, shipped by the owners. There were also two hundred barrels of flour, shipped through Wysham & Son, of the "Oakland" brand, which belonged to the plaintiff. The plaintiff's flour was proved to have been, when shipped, good and sweet, of a superfine quality, which brought an extra price in the Baltimore market, perfectly fresh, and carefully put up in barrels well made out of seasoned timber. The bill of lading described this flour of the plaintiff as shipped for "Valparaiso and a market," to be there delivered to "Capt. Myrick, or assigns," &c. The letter of instructions from the shippers to Capt. Myrick, dated "Baltimore, 20th of April 1849," directed him to sell the plaintiff's flour to the best advantage. In regard to returns he was to exercise his own judgment, to do that which he thought most advantageous for them. Again this letter says: "In regard to returns you must be governed by circumstances;—it is possible you may sell your vessel, and unless you feel certain that something can be made by investing the proceeds in something to pay a profit here, it would perhaps be advisable to bring or send home the money."

The voyage out was of medium length. When the ship arrived at Valparaiso the captain received a letter from a Mr. Dartnell, a commission merchant, residing in Lima, dated "Lima, July 13th, 1849," and directed to Capt. Myrick, at Valparaiso, in which the writer acknowledges the receipt of a letter from Capt. Myrick, of the "23rd of April," and says that good flour should bring at Lima $10 or $10½ per barrel, also that "the Seaman may probably find a buyer at about $12,000 or $13,000."

16    v.9

It was then proved that the captain sold at *Arica* one hundred and fifty barrels of flour, at $9¼ per barrel, and delivered the same out of the "Harper's Ferry" brand, and Wysham, a passenger on board the vessel, and a witness for the plaintiff, swears, that, in order to get at this "Harper's Ferry" brand, the captain removed out of the way the other flour shipped by Wysham & Son, whilst the second mate of the vessel, a witness for the defendant, says, that the flour discharged at Arica was from the top of the ship, and that the "Harper's Ferry" brand was stowed on top of the others. This was all the flour sold at Arica, but Wysham proves that the captain told him he could have sold the whole of the flour on board, at an average price, a little less than $9¼ per barrel, but that he did not sell it, because he expected a better price at Lima, his advices being that he could get for it there from $10 to $10½ per barrel.

The ship then proceeded to *Callao*, where she arrived on the 5th of October 1849. As to the *condition* of the flour at this time *on board*, Wysham says: "the flour on board the vessel on its arrival at Callao was sweet, and that he tried some of every brand." The second mate, on the other hand, says, that the day after the arrival at Callao sample barrels of each brand were sent ashore, and shortly after news came that the flour in them was sour, and shortly after this orders came from the captain to deliver the whole cargo on the mole; that witness then got the flour up from the hold and examined every barrel on board the vessel, by taking the plugs out and tasting and smelling the flour, and that he found it was all sour; that he then reported its condition to the chief mate, who examined it with the steward, and both pronounced it sour; that it had a very sour taste, the smell was musty, bad, sour and very disagreeable, that when a barrel was opened the smell was very offensive.

In regard to the *delivery* of the flour on the mole, Wysham proves, that between the day of the arrival, (5th of October,) and the 13th of October, the captain sold the vessel for $10,500 on a contract, which obliged him to deliver her within ten days thereafter, and that he afterwards caused all the flour to be

landed on the mole, at a time when the castle and warehouses were completely filled with storage, and that the flour was suffered to remain there on the mole for six or eight days exposed to the sun and light. Dartnell, on the other hand, says the flour was put into warehouses immediately after it commenced being landed day by day, and was not allowed to remain on the mole. As to the *effect* of such exposure upon the flour, two witnesses for the defendant, who had frequently been to the Pacific and carried flour to that market, say that, in their opinion, the exposure of the flour on the mole at Callao for six or eight days would not have any injurious effect upon it, and that it would be better so exposed than if kept in the hold of the vessel. Wysham, on the contrary, says, that from his knowledge of flour, such exposure did it injury, and that, in his opinion, such exposure, even for twenty-four hours, would cause flour to become sour; and Krebs, another witness for the plaintiff, who had been engaged in the business of selling flour, says that exposure to light and heat, or either, is very injurious, and that all flour warehouses are darkened, and that exposure to heat and light for six or eight days would cause it to turn sour.

As to the *sale* of the flour, the plaintiff offered in evidence a letter from Capt. Myrick to Wysham & Son, dated "Lima, October 13th, 1849," in which he says he had sold their flour at $8 per barrel, a price much less than he anticipated, but occasioned by the market being overstocked. This letter also states, that "all the different brands kept perfectly sweet, and appears as fresh as when shipped at Baltimore." Dartnell, a witness for the defendant, proves, that all the flour in the cargo was sold, some ten or fifteen days after the vessel's arrival, by him, as local consignee, at the request of Capt. Myrick, at $8 per barrel, on condition of being sound and merchantable, as represented to the purchasers; that sample barrels were delivered on the day of sale to the purchasers, who, within twenty-four hours thereafter, threw up the purchase, because the bread made from these barrels was not sound; that the quality of the flour was then examined by the seller, in company with competent and impartial persons, and

was found to be sour, thus rendering it impossible to compel the purchasers to receive it; that had the purchase been brought before the tribunal of commerce, which would have caused an official examination, the laws of the country would have condemned the flour to be thrown into the sea, as had been frequently practiced there; that after the purchase was thus abandoned attempts were made to sell the flour, and some few sales were made before Capt. Myrick left Lima, and before its bad character became known; that upon consultation with, and at the request of, Capt. Myrick, witness shipped one hundred and fifty barrels of this flour, (one-half being the plaintiff's flour and the other half that shipped by the owners,) to Paita, where it was placed at $10 per barrel, but being found unsound, it was afterwards sold by the consignees there at $4 per barrel; and that Capt. Myrick left Lima about the 12th of December 1849, having staid until that date endeavoring to effect sales of the flour. It was also proved that it was the usage and custom, and that the laws of Peru required it to be done, for all supercargoes or consignees to employ a local consignee to effect sales of cargoes, and that all mercantile transactions there were conducted in the Spanish language.

The account of sales were then offered in evidence by the defendant, showing that all the flour was not sold until the 12th of June 1850. In these accounts various charges, including those for the landing, reshipment, and freight of the flour sent to Paita, were deducted from the gross sales, and the result was an almost entire loss of his flour to the plaintiff. It was also proved by another witness, that he, (witness,) was out in the Seaman in 1848 with Capt. Myrick, then acting as captain, and that they had a consignment of flour on board, and that the same proved sour and the shipment resulted badly. It was also proved that Baltimore flour, when carried to Callao, is very liable to become sour and unmerchantable.

The plaintiff then asked instructions, in substance as follows:

1st. If the jury find from the evidence that defendant was part owner of the "Seaman" when she sailed from Baltimore, in April 1849, and so continued until the vessel was sold by him at Callao; that such sale was there made as stated by the

witness Wysham; that the plaintiff's flour could have been sold by defendant at a fair and reasonable price, if he had made proper efforts to sell it, at some one or more of the ports at which he had arrived before he went to Callao; that he went to Callao under the expectation of selling the vessel there at an advantageous price, and would not have gone so far except for such expectation, and that such extension of the voyage was not made in consequence of any obligation of duty, and was not the offspring merely of a desire to promote the interest of, and fulfil his duty to, the owners of the cargo consigned to his order, and that in consequence thereof plaintiff's flour became deteriorated and damage resulted to him, then the plaintiff is entitled to a verdict for such damages as the jury shall find he really sustained from the extension of the voyage to Callao.

2nd. If the jury find the facts set out in the first prayer, and that defendant had visited Callao, as master of the same vessel, in 1848, and on that voyage the cargo consisted in part of Baltimore flour, which became sour by reason of the character and length of the voyage, and that such flour, when carried in such a vessel to Callao, is very liable to become sour and unmerchantable in a voyage of the usual length, and that defendant had experience and knowledge of such liability; that defendant went to Callao in the present voyage to accomplish his own purposes, or to promote the interest or objects of the owners of the vessel, and that a prudent and careful consignee, under the state of facts as the jury shall find them from the evidence, ought not to have carried the plaintiff's flour to Callao, then plaintiff is entitled to recover such damages as the jury shall find he sustained from the carriage of his flour to Callao.

3rd. If the jury find that defendant sold at Arica one hundred and fifty barrels of flour, part of the cargo, at $9¼ per barrel, and that this was a fair price for flour at that time in that market, and that in making this sale defendant acted judiciously and with sound discretion; that he filled this contract of sale by delivery of flour in which he was interested, and shall not find that the purchaser was unwilling, or, in

case the offer had been made, would have been unwilling, to receive a proportionate part of this quantity from the plaintiff's flour; that defendant's object in so filling this contract exclusively out of the lot in which he was interested, was to secure to himself and his co-owners the supposed benefit of this contract in exclusion of the owners of the other flour, and that this discrimination was not made *bone fide*, and that loss was occasioned to the plaintiff thereby, then the plaintiff is entitled to recover such damages as the jury may find he actually sustained, by defendant's omission to deliver a proportionate part of these one hundred and fifty barrels out of his flour.

4th. (This prayer was abandoned.)

5th. If the jury find that defendant sold one hundred and fifty barrels of flour at Arica, at $9¼ per barrel, and filled the sale out of flour in which he was interested, and that he could, if he had consented and been willing, have sold the whole cargo, at an average price, a little under $9¼ per barrel, and that this would have been a fair and reasonable price, and that he refused so to sell the whole because of his unwillingness to reduce the price of that which he did so sell; and shall not find that the lot actually delivered on this sale was of superior or better quality than the other flour on board his ship, and that a prudent and careful person, under the actual state of facts, as the jury shall find them from the evidence, ought, in the absence of any ulterior objects, to have sold the whole cargo at such average price, then the plaintiff is entitled to a verdict for such damages as the jury may find from the evidence he actually sustained from defendant's omission to sell his flour at Arica.

6th. If the jury find that defendant sold the vessel, after his arrival at Callao, on or before the 13th of October 1849, under a contract to deliver her within ten days, and that within these ten days he discharged the cargo, in order that he might be ready to comply with this contract, and that at the time the cargo was so discharged the castle and warehouses at Callao were entirely filled with articles there stored, so that it was impossible to store therein the flour so discharged, and that the flour, if landed, would necessarily have to remain

Gaither *vs.* Myrick.

on the mole until room could be found for it in the castle or warehouses, and that this was known to defendant before the flour was landed, and that when landed it was left on the mole for six or more days before it could be, or was, received into the castle or warehouses, and that whilst it so remained on the mole it was exposed to the action of the weather and was thereby injured, then the plaintiff is entitled to recover such damages as the jury may find he really sustained from such landing of the flour and exposure on the mole.

7th. That by the terms of the bill of lading the flour was delivered to defendant as consignee as soon as, and whenever, the vessel reached Valparaiso and a market, and if the jury find there was a proper market for this flour at Arica, such as a prudent and judicious owner, acting in the premises, ought and would have embraced, and that defendant had knowledge of the contents of the bill of lading and of the fact that there was such a market at Arica, then his omission to avail himself of it was negligence and want of due care on his part as consignee, and the plaintiff is entitled to recover such damages as the jury may find he really sustained by reason of such negligence and want of care.

8th. If the jury find that defendant caused the plaintiff's flour to be landed and left on the mole at Callao, in the manner stated by the witness Wysham, and that at the time he had not found a market therefor, and did not then know, and had not then any reasonable ground for believing, he would be able to sell the same there at a fair price or for its value, then such removal was an improper act on his part, if the jury find it was done by his orders, and if they further find the plaintiff sustained damage therefrom, he is entitled to a verdict for such damages as they may find he really sustained thereby.

9th. If the jury find the facts set forth in the preceding prayer, and that before such landing sample barrels had been delivered at Callao, and that upon trial thereof the flour therefrom had been pronounced sour and the bread made from it bad, and that by the laws then in force at Callao sour flour was unmerchantable and could not be sold except in violation of these laws, and was liable to be cast into the sea and thus

Gaither *vs.* Myrick.

totally lost to the owner, and that these facts were known both to defendant and the person he employed to act for him in the sale of the flour, and that notwithstanding such knowledge defendant afterwards caused the flour to be landed at this port, as stated by Wysham and the second mate, such conduct was improper, and amounted to negligence and want of due care on defendant's part, and the plaintiff is entitled to recover such damages as the jury may find, in case they should find that any, did result to him thereby.

11th. If the jury find the facts set forth in the preceding prayer, then no allowance should be made by them for the expenses incurred in the landing of the flour at Callao which was reshipped to Paita.

12th. If the jury find the facts set forth in the 10th prayer, and that one hundred and fifty barrels of the flour were afterwards reshipped from Callao and sent to Paita, then no allowance should be made by them for the expenses incurred in such reshipment.

13th. If the jury find that after defendant found that plaintiff's flour could not be disposed of at a fair price, or for its value, at Callao, he consented or permitted that part of it should be sent to another market, to be there disposed of by another person, without the knowledge or consent of the plaintiff, or of any member of the firm of Wysham & Son, and that he remitted and abandoned all and any supervision over the flour, and over its sale and disposition, in the meantime, then such conduct was a violation of his duty as consignee, and even if the jury shall find that some other person assumed to sell the flour in the absence of the defendant, and without his knowledge and approval of the terms of sale, such sale is not binding on the plaintiff, unless they find that he, or Wysham & Son, ratified or recognised such sale as validly made, and notwithstanding such sale plaintiff's title to the flour has not been divested, and the jury, if they find the facts set forth in this prayer, may and ought to find that defendant has unlawfully converted and disposed of the flour to his own use, and is liable in this action for such damages as the jury may find from the evidence the flour was worth at the time of such conversion.

14th. If the jury find that flour was shipped by Wysham & Son on board the Seaman, as shown by the bill of lading, and that two hundred barrels thereof was designated as "Oakland" flour and belonged to the plaintiff, and that it was in good condition, fresh and sweet, and of extra quality as superfine flour, and was carefully and properly barrelled up in barrels well made of seasoned timber, then the burden of proof is on the defendant to show, if he shall affirm that the flour became sour and spoilt before it was landed from the vessel, that it became sour and spoilt without any negligence or want of due care on his part.

The court, (FRICK, J.,) granted the 14th prayer, but refused all the others, and to this refusal the plaintiff excepted. The verdict and judgment were in favor of the defendant, and the plaintiff appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*William Schley* for the appellant, argued, that the court below erred in its refusal to grant each of the rejected prayers except the *fourth,* which he admitted was too broad, and therefore abandoned it.

*1st Prayer.* The plaintiff proved by Wysham that defendant sold at Arica one hundred and fifty barrels of flour of the Harper's Ferry brand, and that to get at this brand he removed out of the way the flour shipped by Wysham & Son. The same witness proved that the vessel arrived at Callao on the 5th of October 1849, and that between that day and the 13th defendant sold the vessel under a contract, which obliged him to deliver her within ten days thereafter. It was also proved that defendant was interested in the flour of the Harper's Ferry brand. A letter from Dartnell, offered in evidence by defendant, dated at Lima, on the 13th of July 1849, and *which was received by defendant at Valparaiso,* stated that "the Seaman may probably find a buyer at about $12,000 or $13,000." This was in answer to a letter from defendant, dated the 23rd of April, and which, of course, was written

17     v.9

before he sailed from Baltimore.   There was evidence there-
fore from which the jury *might* have found, if they so believed,
that he went to Lima, *for the purpose of selling the vessel there;*
and as he sold his own flour at Arica, there was evidence from
which they *might* have found that *he* thought a sale at Arica,
at the price which could have been obtained there for the
entire cargo, a desirable price; and *might* have found further
that his real inducement to go to Lima was to find an advan-
tageous sale for his vessel.   The reason why he did not sell
at *Arica* was to keep his vessel in *ballast,* and he went to
Callao to sell his *vessel,* and not to sell his *flour.*   This was
evidence ·from which the jury might infer that he went there
from bad motives and for his own interest.   This prayer looks
to the liability of the defendant as *consignee* of the flour which
was shipped for " Valparaiso and *a market.*"   As to the gen-
eral duties of a consignee: he must not discriminate in his
own favor to the prejudice of his principal, (*Russell on Fac-
tors,* 33, 270, 271, in 48 *Law Lib.*, 34, 170, 171, 172;) he
must exercise the purest good faith, (*Paley on Agency,* 11,
17.)   It is true the letter of instructions from Wysham & Son
to the defendant speaks of the possibility of the *sale of the
vessel,* but it does not contemplate such a sale on *any contin-
gency.*   It is in reference only to the *return* voyage that this
sale is spoken of, and it clearly never contemplated a sale
until the *voyage out* was completed; that is, until a *market
was found for the flour;* for the contract of affreightment was
not *completed until then.*   It is said there is no proof of the
*quantum* of damages, but this is not so.   It was in evidence
that the flour was put up in extra order and was sweet, that it
went along with that which was sold at Arica for $9¼ per
barrel, and the presumption is that the plaintiff's was equally
good with that sold there.   When it arrived at Callao it was
at first sold at $8 per barrel, and the subsequent sales were
for less and less; all these are facts from which the jury could
fix the standard of damages, and the prayer does not ask for any
specific sum, but only for such damages as the jury may find.

  *2nd Prayer.*  This prayer is based on the same hypothesis
as the first, with the additional facts, that defendant had expe-

rience of the injurious effect of a protracted voyage on a cargo of flour, and it submits *to the jury* the question of fact, what a prudent consignee, under the circumstances, ought to have done: whether a party has exercised *reasonable care and skill* is a question for the jury.

*3rd Prayer.* This prayer differs from the first and second, in introducing the element of purposed discrimination by the defendant in filling the sale at Arica with his own flour, in exclusion of any part of the plaintiff's flour. The legal proposition is, that the defendant in accepting the commission as consignee, was bound to act in the business of the plaintiff in the like beneficial manner as he acted in his own business. The Harper's Ferry brand, which he sold at Arica, was the only flour which had been shipped for Callao, and yet he sold that before it reached its destination, leaving the plaintiff's flour, which had been shipped for an intermediate port and a market, unsold. The jury upon all these facts might have found, if they really so believed, that he made the discrimination for his own advantage as one of the owners of the Harper's Ferry brand. On this point see 2 *Pick.*, 123, *Barrett vs. Lewis.* 5 *Leigh,* 456, *Johnson vs. O'Hara.* 4 *How.,* 554, 559, *Michoud vs. Girod.*

*5th Prayer.* This prayer is based on the evidence of Wysham, that the *whole of the flour on board* could have been sold at a little less than an average of $9\frac{1}{4}$ per barrel, if defendant had been willing to sell at that price. The jury might have discredited the statement to Wysham, that he did *not* sell because he expected a better price at Lima. The jury *might* have found from all the evidence that he retained the flour unsold, in order that he might carry his vessel to Callao without want of ballast.

*6th Prayer.* There was conflicting evidence as to whether the exposure of the flour on the mole for six or more days would cause it to turn sour. The jury might have agreed with the notions of the plaintiff's witnesses on this point. There surely was evidence to go to the jury on this point. There was also evidence to justify their finding every fact embraced in the hypothesis of this prayer. This prayer con-

cedes, (which is ·denied in the eighth prayer,) that he might properly land the plaintiff's flour *before* he had found a market, but insists that he had no right to land it until he had procured proper *storage*.

*7th Prayer.* This prayer involves the construction and effect of the bill of lading. The terms, " *Valparaiso and a market,*" mean, till a market is found. (1 *Philip on Ins.*, 496. 5 *Pick.; 51, Chase vs. Eagle Ins. Co.* 16 *Do.*, 303, *Deblois vs. Ocean Ins. Co.* 1 *Arnold on Ins.*, 359, 438.) The defendant therefore had no right to land the cargo at Callao, having gone beyond Valparaiso, unless there was there an actual market. In a policy of insurance the terms, "Valparaiso and a market," would have continued the risk until a market was found. The defendant therefore was bound to carry our goods until he found a market; the contract of affreightment was not completed until then. This expression also means, as I understand it, that the cargo may be sold at any intermediate port before reaching the named port.

*8th Prayer.* This prayer affirms that it was an improper act for the defendant, as master, to land the flour, and equally improper for him as consignee to receive the flour, before he had assurance, or reasonable assurance, of a market at Lima. By the terms of the bill of lading he was bound to go further, if necessary, until a market was found, or, in the alternative, to retain it on board. *Angell on Carriers, secs.* 95, 97, 281.

*9th Prayer,* This prayer is based, in part, on the evidence of Dartnell, that the act of landing sour flour was in contravention of law, and exposed the articles to condemnation and destruction, and on the evidence, (as sought to be established by defendant,) that the flour was sour before it was landed, and so known to defendant. The act was inconsiderate and imprudent, and placed defendant, as proved by Dartnell, in the power of bakers and other persons there, and produced eventual heavy loss.

*10th, 11th, 12th Prayers.* These prayers look to the expenses of landing, of reshipment, and of freight on the one hundred and fifty barrels landed at Callao and subsequently shipped to Paita, because, as alleged, there was no market at

Gaither *vs.* Myrick.

Callao. The defendant in his accounts of sales had deducted these expenses, and it was shown by the facts that there was no market at Lima.

*13th Prayer.* The defendant sent the flour to another person in another market for sale. The flour sent to Paita was sold at prices which left the charges thereon unpaid by $235.12. The defendant had no right to dispose of the consignment in this manner. It was an unlawful conversion of the flour. Whenever a party is entrusted with an agency or a trust in which he is to exercise his discretion, it is a *personal trust,* which cannot be *delegated.* 4 *Camp.,* 183, *Catlin vs. Bell.* 1 *Hill,* 501, 505, *Commercial Bank vs. Norton.* 26 *Wend.,* 485, *Lyon vs. Jerome.* 8 *Barr.,* 442, *Etter vs. Bailey.* 11 *How.,* 223, *Warner vs. Martin.*

*John Nelson* for the appellee, stated that the facts of the case show, that the letter of instructions from Wysham & Son to the defendant, written at the commencement of the enterprise, spoke of the possibility of the sale of the vessel during the voyage, showing, therefore, that this matter was well known to the parties, and also that, in addition to the flour of the plaintiff, there was flour of the owners, of whom the defendant was one, and in all sales of this flour that of the plaintiff shared equally with that of the defendant, except at Arica, where the sale was of the *Harper's Ferry brand* only, and none of the plaintiff's flour was of that *brand.* He then argued, that the court below properly rejected all the prayers which were refused.

*1st Prayer.* Because it is based on an hypothesis resting upon facts assumed, and opposed by the testimony in the cause. It assumes as proven:—1st, that there was an occasion offered for a sale of the flour at an intermediate port; 2nd, that defendant went to Callao with a view to the sale of his ship; and 3rd, that by this prolongation of the voyage the flour was injured. Of these facts, thus assumed, there is not a title of evidence. Again, the jury could not find damages unless there was proof of them. There is no proof as to what the condition of the flour was at Arica when it arrived there. There is no proof that it was examined there or that it was

then sweet. There is, therefore, no evidence or standard from which the jury could estimate the damages. 2 *Md. Rep.*, 217, *Merchants Mutual Ins. Co. vs. Wilson.*

*2nd Prayer.* Is liable to the same objection as the first. There is no evidence that the defendant went to Callao in 1848; the only testimony on this point is, that he was in the Pacific in 1848. There is, therefore, no evidence tending to show that he had experienced a knowledge of the fact that flour was liable to sour in Callao.

*3rd Prayer.* For the same, and additional reason, that defendant was under no legal obligation to sell in the manner affirmed by this prayer. A consignee is to use reasonable diligence and discretion, and the only test of this is, whether he takes the same care of the property of his *principal* as he does *of his own,* and this was done in this case. There is no evidence that the purchaser at Arica would not be unwilling to receive a part of the *several brands.* The sale was of *Harper's Ferry brand,* and this is *prima facie* proof that he was unwilling to buy any other. There is no *obligation* on the part of a factor having a general cargo, to sell at an intermediate port a part of all the various consignments, and no authority can be found for such a proposition.

*5th Prayer.* Because it was opposed to the only evidence in the case having relation to the subject. The only evidence that defendant had an opportunity to sell the whole cargo at Arica is that of Wysham, offered by the plaintiff himself, and this witness states that the reason why defendant did not sell at Arica was, that he could get a better price at Callao. If, therefore, he could get a better price at Callao, it *was not his duty* to sell at Arica. Besides, the proof is that he carried two hundred and fifty barrels of his own flour to Callao.

*6th & 8th Prayers.* Because there was no sufficient evidence to go to the jury in support of the hypothesis of these prayers. The two are connected and have relation to the discharge of the cargo at Callao. They do not put to the jury to find that the flour was sweet when it arrived at Callao, and there was therefore no evidence upon which the jury could find there was any damage. There is no proof that the discharge was

made in order to expedite the sale of the vessel, or that the castle and warehouses were then full of storage. Again, there are facts in the case which have an important bearing on these propositions. The sale of the vessel was in contemplation of the parties when the voyage was commenced. The ship was cleared for Callao, and was to go beyond Valparaiso. The defendant had written to see if a sale of the vessel could be effected at Callao. After he had sold the vessel it was clearly competent for him to discharge the cargo. What was he to do with the cargo when he undertook the voyage, with the knowledge and assent of the consignors that he was to dispose of his vessel? If the testimony shows that, in the exercise of a reasonable discretion and judgment, he put the flour on the mole, independent of the sale of the vessel, he did all that the law requires of him, and as to this the witnesses say it was better to put the flour on the mole in that climate than to keep it in the hold of the vessel. The prayers exclude this from the jury.

*9th Prayer.* Because there was no evidence of any damage sustained by the plaintiff from the act complained of in this prayer. If the flour had been cast into the sea the plaintiff might have a ground of claim, but it was not cast into the sea and the penalty therefore did not attach. There is no evidence that there was any damage occasioned by the landing of the flour, in violation of a penal law prohibiting it from being landed. There is the same uncertainty in regard to the *data* or standard of loss.

*10th, 11th, 12th Prayers.* Because the reshipment to Paita was rendered necessary by the condition of the market at Callao, and was in pursuance of the defendant's duty as factor. These prayers, with the 7th and 13th, involve the question of the true construction of the bill of lading, which is the important question in the case. What is meant by " *Valparaiso and a market?*" It means that if the ship did not find a market at Valparaiso, she was to go further and elsewhere to find a *market*. "A market" means *posterior* to the *named port*—you must go to Valparaiso *at any rate*. The question then is as to the duty of the party on arriving at

*Callao,* the *ultimate* destination of the vessel.   The case in 4 *Camp.,* 183, was that of an insurance of a cargo to be sold in the West India Islands, and it was held that a *new destination* could not be *given* under this risk, but that is not the present case, for here the defendant *was to give,* by the terms of the bill of lading, a *new destination* if a market was not found at Callao.   The case in 11 *Howard,* was one of personal trust and *confidence,* and the sale was made by the *clerk* of the party to whom the tobacco was consigned, and it was held, that a factor cannot delegate his power to a clerk unless by express contract.   That is not this case.   May not the master of a vessel, in a *case of necessity,* commit the property of his *principal* to a *third party* for sale ?   This is the question here, and, I think, the authorities clearly show that he may do so. 1 *Johns. Cases,* 175, *Lawler vs. Keaquick.*   31 *Maine,* 409, S*tone vs. Waitt.*   2 *Pick.,* 615, *Day vs. Noble.*   The case last cited is precisely the present case.   The defendant left the flour in the hands of a trustworthy merchant, and *his own flour,* with that of the plaintiff, was sent to Paita and there sold.   There is therefore no imputation, nor any ground for an imputation, resting against this defendant.

Tuck, J., delivered the opinion of this court.

The appellant sued the appellee, to recover damages for losses alleged to have been sustained on the sales of flour shipped on board a vessel which sailed from Baltimore, for "Valparaiso and a market," of which the appellee was part owner, master and supercargo.   Misconduct, negligence, and consequent liability, are imputed to him in each and all of these capacities.

At the trial *fourteen* prayers were offered by the appellant, all of which were refused, except the last.   They involve the construction of the contract, and the extent and proper exercise of the discretion reposed in the appellee, under the circumstances by which he found himself surrounded, at his first port of destination, and afterwards in the progress of the voyage. The questions presented, in the argument, will appear by the statements and points filed, and we shall dispose of them in

their order; first, however, stating generally the rules of law by which we suppose cases of this kind to be governed.

The principles which regulate the conduct of factors abroad apply to supercargoes. *Beawes' Lex. Merc.*, 44, 47. *Story's Agency, sec.* 33. They are liable for injuries to the employer, occasioned by the want of reasonable skill or of ordinary diligence, by which is to be understood "such skill as is, and no more than is, ordinarily possessed and employed by persons of common capacity engaged in the same trade, business or employment; and by ordinary diligence that degree which persons of common prudence are accustomed to use about their own business and affairs." *Story, sec.* 183. They are also bound to good faith, and must exercise their judgment after proper inquiries and precautions, and, where they have a venture on the same ship, they are bound to exercise, at least, as much diligence and care, as to their factorage transactions, as they do as to their own private concerns. And they are chargeable for negligence if they sell without making proper inquiry, after having received notice of facts which ought to put a person of prudence on his guard. *Ib., sec.* 186. *Russell on Factors & Brokers*, 33, 34. As a general rule they cannot delegate their authority, any more than other agents, but exceptions may arise where the power of delegation is conferred by the necessity of the case, the usages of trade, or the law and customs of the country where the agency is to be executed. *Story, secs.* 13, 14, 34, *a.* 11 *Howard*, 209. Where, as in this case, the master is made consignee of the cargo, the duties and liabilities are as distinct as if confided to different persons. *Story, sec.* 41.

The responsibility of the defendant in his capacity of part owner and master arises from the sale of the ship, and the alleged improper delivery of the flour at Callao. It is the duty of the ship to convey the cargo according to the projected voyage, and this must be done by every reasonable and practicable method. "Every act that is not properly and strictly in furtherance of this duty is an act for which both the master and owners may be made responsible." *Abbott on Shipping*, 241. There are emergencies under which a sale of the cargo

and even of the ship may be justified, but the necessity of the case must require that course.   This necessity may arise suddenly, and under circumstances that could not have been provided for.   "In general, it may be said that, (in such a case,) the master is to do that which a wise and prudent man will think most conducive to the benefit of *all concerned;*— some regard may be allowed to the interest of the ship and its owners, but the interest of the cargo must not be sacrificed to it.   Transhipment for the place of destination, if it be practicable, is the first object, because that is in furtherance of the original purpose: if that be impracticable, return or a safe deposit may be expedient.   The merchant should be consulted, if possible.   A sale is the last thing that the master should think of, because it can only be justified by that necessity which supersedes all human laws.   If he sell without necessity, his owners, as well as himself, will be answerable to the merchant."   *Abbott,* 243.   1 *Arnould on Insurance,* 189, &c. *Smith's Mercantile Law,* 171, 292.

As to the construction of the contract: that is, the meaning of the words to "Valparaiso and a market," we understand the counsel to agree that they must be interpreted according to the analogy of this case to one arising under a policy of insurance containing such a clause; and by this test, we think, they authorised the ship to visit such other ports, beyond the one named, as the appellee thought expedient, in the exercise of a sound discretion.   *Deblois vs. Ocean Ins. Co.,* 16 *Pick.,* 303.   Whether he was under any obligation to seek a market this side of Valparaiso, or to go there in the first instance, we need not decide, inasmuch as he did visit the named port, and no question is made on this part of the case.   These terms also imposed on the ship the carriage of the cargo until a market was found, or the goods left on deposit for sale under circumstances authorising such a departure from the original contract of affreightment.   In the case of *Richardson vs. London Ass. Comp.,* 4 *Camp.,* 93, the goods in question were the investment of an East India captain, and the voyage was described in the policy to be, "at and from London to Maderia, the Cape of Good Hope, and all or any of the ports or places in

Gaither *vs.* Myrick.

the East Indies, &c., until *arrived at the last place of discharge on the outward voyage,* with leave to exchange the goods in the course of the voyage." The company's cargo was discharged at Calcutta, (a place within the policy,) and the ship ordered with another cargo to Madras. The captain had also *landed* the whole of his investment at Calcutta and had disposed of a considerable part of it; but, being unable to sell the residue, he resolved upon a new market, and for this purpose reloaded it on board the ship for Madras; on which intermediate voyage she was lost. The question was, whether, under the terms of this policy, the risk still continued on the residue of the captain's investment on board at the time of the loss, or whether it had ended at Calcutta? Lord Ellenborough held, that the risk had ceased at Calcutta, "the last place of discharge on the outward voyage." If, he said, "the company's officers wish for the protection which is here sought; (that is, until the goods are finally disposed of in some market in the East Indies,) they must not limit the risk to the duration of the outward voyage, but extend it to the *arrival of the goods to a market at their final port of discharge.*" It is added by *Mr. Arnould,* ( *Vol.* 1, 439,) "There can be no doubt that an insurance in *such form* would effectually protect the goods until actually disposed of in some foreign market." If this be the liability of the insurers in such cases, it is clear that it is the ship's duty to carry the cargo until disposed of.

We proceed to apply these principles to the case before us.

The *first* prayer was properly refused, because it submitted to the jury the finding of facts of which there was no sufficient evidence. One specification is sufficient. There was nothing from which the jury could have found that the defendant did not make reasonable efforts to sell the plaintiff's flour at a fair price, at some one or more of the ports which he visited before he reached Callao. On the contrary, it was in proof that he had offered the flour at Arica, and, not satisfied with the prices there, said he was going to Lima, of which Callao is the outer port, because he had received advices of better prices at that place. In the absence of evidence of such negligence and misconduct, the law does not presume that he did not make

reasonable efforts to effect sales at such ports as he thought it expedient to visit, as it was his duty to have done; and especially as that presumption is rebutted by the consideration that it was his interest, as part owner, to sell the cargo as soon as practicable. And, even if he could have made sales at Arica or elsewhere, he had a discretion to do so or not, provided it was fairly exercised. The nature of the voyage—for a named port and a market—necessarily implied, as we have seen, that he was not bound to sell at the first or any other port, if he had reason to believe that he could find a better market by going further, and acted in good faith on such information. We may illustrate this view, (and the same applies to propositions presented by some of the other prayers,) by supposing that, with the advices he had received at Valparaiso before him, he had sold the plaintiff's flour at Arica for the price offered, and had then sailed for Lima, and there sold his own flour at the higher price named in his advices. Would not the plaintiff have had good reason to complain that he had sold his flour at the wrong market? Yet, when he has acted upon the information received, and loss has occurred to the plaintiff, he is charged with negligence. Certainly the result should not alter the application of the principle.

Objections equally fatal apply to the *second, third* and *fifth* prayers. The *second* is based in part on the first, besides embodying other propositions of fact without evidence to sustain them, which we need not indicate.

The *third* is objectionable for the reason that there is nothing to show that the purchaser of the one hundred and fifty barrels sold at Arica, was willing or unwilling to have taken any of the plaintiff's flour as part of the quantity he wanted. To fix liability on the appellee in this aspect of the case, could only be done by drawing an inference against his interest and duty, when there is nothing in his management of the cargo, up to that time, to show that he was not governed by a desire to promote the interests of all concerned. Flour is sold by the brand it bears, and there is no evidence that the purchaser at Arica wanted any other than the particular kind that he bought, and the plaintiff's flour was not of that brand. Besides, this

prayer imputes to the appellee not only gross negligence, but want of good faith to the owners of the cargo, against the presumption that an agent has done his duty until the contrary appears. *Corner vs. Pendleton,* 8 *Md. Rep.,* 337.

The motive attributed to the appellee, by the *fifth* prayer, for not selling all the flour at Arica, is not warranted by the proof, but in conflict with the only evidence on the point. Wysham proved that the appellee's reason, as he informed him at the time, for not selling there at less than nine dollars and-a-quarter, was, that from information received, he expected to obtain ten or ten and-a-half at Lima. In the face of this proof, and in the absence of any sustaining the theory of the prayer, it was impossible for the jury to have found that he did not sell at Arica, because of an unwillingness to reduce the price of his own flour to an average less than he could obtain for the quantity which he actually sold.

In addition to the above views all the preceding prayers proceed, in part, on an assumed violation of duty which the law does not infer, denying to the appellee any discretion whatever; whereas, as we have seen, the doctrine is well settled, that persons in his capacity are often compelled to act in a manner which the law does not sanction, if access can be had, or information given to, and directions received from, the principal. If the law were otherwise, it is difficult to imagine that such agencies would be accepted at all, imposing liability for mere errors of judgment, committed in the honest exercise of discretionary powers.

We entertain, however, a different view of the propositions presented by the *sixth* prayer. The ship arrived at Callao on the 5th or 6th of October, as proved by Wysham and Dartnell. The appellee wrote, on the 13th, that the flour had kept perfectly sweet, that he had sold it at $8, and that the vessel also was then disposed of. Wysham proved that the vessel was sold to be delivered in ten days, and that after that sale the defendant caused all the flour to be landed on the mole, when there was no storage for it, and that it was injured by such exposure, though, on this point, and as to the condition of the flour, at the time of arrival, there was conflicting evidence.

Gaither vs. Myrick.

One of the witnesses also stated that sample barrels were sent ashore which were tried, and the flour pronounced sour, and that the appellee had all the flour delivered on the mole, after he knew that the first purchase had been thrown up. Now, if the appellee had not discovered, on the 13th, that the flour was damaged—and that he had not is clear from his own letter—the inference is that he sold the vessel before the cargo had been landed, and, (according to the evidence of the mate,) that it was landed after he knew its unsound condition, and before he had made a second sale, or obtained storage for it. Upon the state of case submitted to the finding of the jury by this prayer, if the appellee landed the flour, "in order that he might be ready and prepared to deliver the vessel pursuant to the terms of the contract of sale," and the flour was injured by such exposure on the mole, the plaintiff was entitled to recover for the loss resulting from such disposal of the cargo. Upon this hypothesis there was no excuse for landing the flour at all without having first made sale of it, or obtained proper storage; and the case is stronger against him, if, as he wrote, and Wysham states, the flour was sweet. The prayer ascribes a motive for the landing, to be found by the jury, inconsistent with the interest of the shippers, and merely looking to the interest of the ship-owners, and which, if true, was, to the extent of the damage thereby incurred, a sacrifice of the interest of the cargo to that of the owners of the vessel. *Abbott*, 243. We have seen that the ship may be sold under pressing emergencies, but there was no such necessity if the hypothesis of the prayer be correct. The counsel for the appellee adverted to the letter of Wysham & Co., in which it is said, "it is possible you may sell the vessel," for the purpose of showing that the plaintiff knew, at the time of the shipment, that a sale was in contemplation. This letter had reference to a return cargo; we suppose that it was never imagined by any of the parties that the vessel would be sold before the flour was disposed of. The ship may always be sold if the owner or the master choose to violate a duty. It cannot be prevented. But the power to sell is subordinate to the claim of the cargo to be carried and delivered according to

the projected voyage; and that the owners of this cargo knew that the vessel might possibly be sold, can have no effect upon their claim for damages, if they incur loss by the sale.    The obligation to carry the cargo is, generally, paramount to every other duty, and yields only to that "necessity which supersedes all human laws." *Abbott*, 243.    True, the appellee had an interest in selling the ship, but he had also incurred an obligation to the plaintiff; and, as was said by Lord Ellenborough, in 1 *Campbell*, 527, "No man should be allowed to have an interest against his duty."

According to the rules governing the case as applied in disposing of the *first* prayer, we think there was no error in refusing the *seventh*.    There was nothing to show that the conduct of the appellee, at Arica, was different from what a prudent and judicious owner would have done under the same circumstances, and with the same advices before him.

If, as stated in the *eighth* prayer, the defendant, not having found a market, had the flour landed, and placed, and left on the mole at Callao; and if it became damaged, before a sale could be effected, by reason of exposure there for six or eight days, it is very clear that he was liable for the consequences. This, however, was for the jury, about which there was evidence on either side.

We think the *ninth* prayer was properly refused.    It is merely speculative as to losses that might have resulted from landing sour flour in violation of the local laws.    But, as the flour was not seized and condemned under these laws, the plaintiff cannot be said to have suffered by an act subjecting the flour merely to the risk of being taken and destroyed, in the absence of proof that such violation of the law did place the defendant in the power of dealers in the article, whereby loss was actually incurred by the plaintiff.

The *tenth*, *eleventh* and *twelfth* prayers relate to the expenses of landing, reshipment and freight of the flour that was sent to Paita.    It was the duty of the ship to have carried the flour to a market, or until finally landed under circumstances authorising a departure from the original contract, which, as we have said, had not occurred at Callao.    Consequently the plaintiff

was not liable for the freight from Callao to Paita. This prayer leaves out of view the sale of the vessel; but as the carrying of the cargo, according to the contract, is the master's first duty, it lies on the defendant to excuse himself for having forwarded part of the flour to Paita, on another vessel, and he cannot charge for such freight.

The *eleventh* and *twelfth* prayers ought also to have been granted, upon the hypothesis of the *tenth*. Until the flour was sold it ought not to have been landed. The landing without a previous sale, was such an act as to relieve the consignor of the flour from all liability for the charges of landing and reshipment.

The *thirteenth* prayer seeks to charge the appellee, as supercargo, for a conversion of the flour, by having sent it to Paita, for sale by another person. We have seen that emergencies may arise to render a deposit of the cargo necessary, as, for example, the sale of the ship, or the want of a market, because a sale cannot be made if a purchaser cannot be found; and other circumstances may arise justifying this course; and if the consignee acts in good faith, with reference to his predicament at the time, he ought not to be censured. The general rule is that the trust cannot be delegated, but this is not without exceptions. "The authority is exclusively personal, unless, from the express language used, or from the fair presumptions growing out of the particular transaction, or of the usage of trade, a broader power was intended to be conferred on the agent." *Story*, sec. 14. Where the consignee is master, and this is known to the shipper, he cannot wholly abandon the latter duty to discharge that of supercargo. He must act in both, as far as possible, with reference to the interest of the respective principals. 1 *Johns. Cases*, 174, *Day vs. Noble*. 2 *Pick.*, 615. There is nothing stated in the prayer to excuse the consignee; but it goes upon the ground that he abandoned his trust to another, merely on finding that the flour could not be disposed of at Callao. In this view, we think, the first branch of the prayer, if offered alone, might have been granted. But it went further, and asked to recover the value of the flour, if the jury found that some other person assumed to sell it in

the absence of the defendant, and without his knowledge or approval of the terms of sale. Of course such a sale would not divest the title of the plaintiff; but it does not follow that the defendant would be liable, because another person wrongfully, and without his privity, had assumed authority to dispose of it. As an entirety the prayer was faulty and properly refused.

It follows that, dissenting from the rulings below on the 6th, 8th, 10th, 11th and 12th prayers, the judgment must be reversed, and a *procedendo* ordered.

*Judgment reversed and procedendo ordered.*