WESLEY RICKETTS and JOHN WHITTINGTON *vs.*
JAMES MONTGOMERY.

As a general rule, a trustee or person acting in a fiduciary character cannot purchase, on his own account, or acquire an interest in property, which his duty or trust requires him to sell on account of another.

An obligation by which a trustee binds himself, in a penalty, to a third party, to sell the trust property absolutely on a certain day, is a contract in violation of his duty; he ought not by his own voluntary act to create an interest against his duty.

An application by the *cestui que trust*, to be allowed to participate in the purchase, which was refused, is not such an acquiescence in the sale to the trustee as to make it valid; if an acquiescence at all, it is but a conditional one, the condition of which was not agreed to.

Where the property is lost or so disposed of, in consequence of the conduct of the trustee, that it cannot be returned or put in a condition to be re-sold, the *cestui que trust* is entitled to the *full value* of the property at the time of sale by the trustee.

The trustee should be charged with the *utmost value* of the property when there is no possible means by which the court can reinstate the *cestui que trust* in his interest, yet when the *actual value* can be *clearly* ascertained, that must be the indemnity.

APPEAL from the Equity side of the Superior Court of Baltimore city.

The bill in this case was filed on the 14th of April 1854, by the appellee against the appellants, and Wm. E. Murphy, and James Hooper, to vacate and annul a sale of the steamer Jewess, made by Whittington & Hooper, on the 1st of March 1854.

Montgomery and Murphy (the latter residing in Louisiana) were each half-owners of the steamer, and differences having arisen between them, as to the employment of the vessel and payment of costs for alterations and repairs upon her, Murphy employed Hooper to procure a sale of her, and a settlement of the accounts, payment of liabilities, and an equitable distribution of the proceeds.   On the 9th of January 1854, Montgomery conveyed his interest in the steamer to Whittington, and on the same day Montgomery and Whittington entered into an agreement by which Whittington was to unite

with Hooper in the sale of the vessel, the sale, however, not to be made before the 28th of February following, and if, in the meanwhile, Montgomery should purchase from Hooper his half of the vessel, no sale was to be made, and Whittington was to reconvey the steamer to Montgomery, and if the sale should be made, the proceeds were to be applied to pay expenses, commissions and debts of the vessel, and the residue to Montgomery and Hooper, in equal proportions. On the 16th of February 1854, Whittington and Hooper entered into a covenant, each to the other, in the penalty of $1000, to sell the vessel at public auction on the 1st of March then ensuing, at one o'clock P. M., at the Exchange. On the day of sale, Ricketts, who was the partner of Whittington, became the purchaser of the vessel at the bid of $12,500, and on the 31st of the same month, Whittington and Hooper conveyed her to the firm of Ricketts & Whittington, by whom she was subsequently sold, and after passing through the hands of various purchasers, was finally lost at sea.

The bill charges fraud on the part of Whittington, in forcing the sale at an unfavorable time, in purchasing at his own sale for less than the value of the vessel, and various other devices, on his part, to defraud the complainant. All of these charges are denied by the answers.

A large mass of testimony was taken on both sides, in reference to the value of the vessel, the allegations of the bill and answers, the facts and circumstances, preceding, attending, and following the sale. The purport of this proof is sufficiently stated in the opinion of this court.

The court below (LEE, J.) passed a decree vacating the sale as to the half of the vessel owned by the complainant, and that Ricketts and Whittington account with him for such half at the rate of $30,000 for the whole vessel, subject to certain allowances and deductions for debts and repairs, and referring the cause to a special auditor to state the account. From this decree Ricketts and Whittington appealed.

The cause was argued before LE GRAND, C. J., ECCLESTON and TUCK, J.

*Levin Gale* and *St. Geo. W. Teackle,* for the appellants, argued:

1st. That Whittington committed no fraud in fact.

2nd. That Whittington did not purchase at his own sale, but became subsequently interested in the purchase.

3rd. That if Whittington was, within the meaning of the rule, a purchaser at his own sale, yet it was at the solicitation of Montgomery who now complains of it, and that this sale was afterwards acquiesced in and *ratified* by Montgomery.

4th. That the testimony shows, that if any fraud in law or in fact, was perpetrated, it was commenced, carried on and enacted by Montgomery himself, and he has no right to ask any redress for the same.

5th. That if any fraud, either in law or in fact, was committed in any of the transactions in reference to the sale or disposition of the steamer, such frauds were committed against the rights and interests of Murphy or Hooper, and that Montgomery was either the author of, or a participant in, such frauds, and that the sale having been ratified by Murphy and Hooper, Montgomery cannot interfere with or avoid the sale.

6th. That the decree, if in other respects good, is erroneous, inasmuch as it places an estimate upon the vessel, as the basis of the accountability of the appellants, far too high, and wholly unwarranted by the evidence.

*Geo. H. Williams,* for the appellee, argued:

1st. That the fiduciary character of Whittington being incontrovertibly established, he could not, in any event, be himself a purchaser, nor interested in any way in the purchase, and the appellee was entitled, as of course, to come in and set aside the purchase without showing even actual injury. 12 *Md. Rep.,* 416, 417, *Keighler, et al., vs. The Savage Manf. Co.* 2 *Gill,* 99, *Brooke vs. Berry.* Ibid., 169, *Bell vs. Webb.*

2nd. The evidence clearly shows that Whittington was interested in the purchase at the time it was made. By the

Ricketts & Whittington vs. Montgomery.

bill of sale of the vessel, made within less than a month after the sale took place, from Whittington and Hooper to Ricketts & Whittington, Whittington is estopped from denying that he was one of the purchasers at the sale.

3rd. That there was no acquiescence in or ratification of the sale on the part of Montgomery, but on the contrary, the day afterwards, his counsel notified Whittington that Montgomery would treat the sale as a nullity, and prohibited any attempt to make a title to any one for the steamer.

4th. That the steamer having been sold and title made in defiance of this prohibition, and the ship placed out of the reach of the court, and finally lost, the appellee is entitled to a decree for one half of her full value as a marketable article, subject to an accounting as to any advances made by Whittington for the payment of her debts; that for the purposes of this cause and for the measure of relief to be afforded the appellee, the true question is, what could she have been sold for? and what did she sell for? And that as against a fraudulent trustee, the highest amount of value will be decreed. 1 *H. & G.* 70, *Ringgold vs. Ringgold.* 15 *Ves.*, 439, *Lupton vs. White.*

5th. That the bond to Hooper of the 16th of February 1854, whereby Whittington disabled himself from being a faithful trustee, was the grossest fraud, and entitles the appellee to the highest amount of damages.

6th. That the estimate put upon the steamer by the decree, so far from being too high, was, in fact, too low, and the only party, therefore, really entitled to complain of the decree is the appellee who has had the value of his steamer estimated, by the court below, at the lowest amount as testified to by any of the witnesses.

ECCLESTON, J., delivered the opinion of this court.

It was conceded, in argument, by the appellants' counsel, that in regard to the sale of the steamer Jewess, made on the 1st of March 1854, John Whittington was acting under an authority from James Montgomery, which constituted the former an agent or trustee of the latter.

7    v.15

It is well settled, as a general rule, that a trustee or person acting in a fiduciary character, cannot purchase, on his own account, or acquire an interest in property, which his duty or trust requires him to sell on account of another. Although this has not been denied, we deem it proper to refer to the case of *Michoud, et al., vs. Girod, et al.,* 4 *How. S. C. Rep.,* 554, where numerous authorities on the subject are cited, and the rigor of the rule is very fully set forth. And it will be seen on page 556, how carefully the rights of the *cestui que trust* are to be protected, even when it has been understood between him and his trustee that the fiduciary relation shall be considered as dissolved, and a sale is then made to the trustee. On this point the court say: "We scarcely need add, that a purchase by a trustee of his *cestui que trust, sui juris,* provided it is deliberately agreed or understood between them that the relation shall be considered as dissolved, 'and there is a clear contract, ascertained to be such, after a jealous and scrupulous examination of all the circumstances, and it is clear that the *cestui que trust* intended that the trustee should buy, and there is no fraud, no concealment, and no advantage taken by the trustee of information acquired by him as trustee,' will be sustained by a court of equity. But it is difficult to make out such a case, where the exception is taken, especially when there is any inadequacy of price, or any inequality in the bargain." After referring to many authorities, the court then says: "And therefore, if a trustee, though strictly honest, should buy for himself an estate from his *cestui que trust,* and then should sell it for more, according to the rules of a court of equity, from general policy, and not from any peculiar imputation of fraud, he would be held still to remain a trustee to all intents and purposes, and not be permitted to sell to or for himself." In addition to the above case, see 12 *Md. Rep.,* 415, 416, 417, *Keighler, et al., vs. Savage Manufacturing Co.*

Notwithstanding Wesley Ricketts, alone, made the bid at which the Jewess was struck off, the circumstances disclosed in evidence have induced us to believe that Whittington, the trustee of Montgomery, and partner of Ricketts, was interested

in the purchase; and that Ricketts knew Whittington was a trustee for the sale of Montgomery's share of the steamer.

Believing, as we do, that Whittington was really, if not ostensibly, a participant in the purchase of the Jewess, at the sale on the 1st of March 1854, then, in view of the principles enunciated in 4 *How.* and 12 *Md. Rep.*, the evidence in the cause is not deemed sufficient to show such a prior assent to, or subsequent acquiescence in, the sale, as should render it valid, and prevent Montgomery from having any right to insist upon its being set aside.

The obligation entered into between Hooper and Whittington, binding each to the other in the penalty of $1000, that the sale should be made, absolutely, on the 1st day of March 1854, at 1 o'clock, P. M., if not sooner disposed of, was a contract in violation of Whittington's duty as a trustee. Such an obligation was calculated to prompt him to sell, for the purpose of avoiding the penalty, when, if untrammelled by the contract, he might believe the rights and interests of his *cestui que trust* demanded a postponement. Thus, by his own act, the trustee's interests would be in conflict with his duty. How, at the time of the contract, could he have known but what the circumstances, on the proposed day of sale, might be such as would work gross injustice to the *cestui que trust*, if the sale should then be made. In *Gaither vs. Myrick*, 9 *Md. Rep.*, 143, the language of Lord Ellenborough is quoted from 1 *Camp.*, 527, where he says: "No man should be allowed to have an interest against his duty." He certainly should not, by his own act, voluntarily create such an interest.

It appears that on the day of sale, at the request of Montgomery, J. M. Kane went with him to the place of sale, for the purpose of asking for a postponement. Whittington was asked to postpone the sale; he replied that he could postpone it no more, that both Mr. Hooper and himself were under bonds to each other of $1000, and that it should be postponed no more, that they had postponed it several times, and now they had entered into that arrangement it should positively be sold that day. It was then proposed to Whittington that he should buy the steamer for Montgomery, to which Whitting-

ton replied that he would not do any such thing, that he would have nothing to do with buying her; that Mr. Ricketts might buy her, and that he (Whittington) had promised to loan Rickets $10,000. Ricketts was then asked to buy her for Montgomery, and he also refused.

During the same afternoon, subsequently to the sale, application was made by Montgomery to be allowed to participate in the purchase, but he was not permitted to do so. This application has been relied upon, in argument, as a sufficient acquiescence, on the part of Montgomery, in the sale. If it was any acquiescence, it amounted to nothing more than a conditional one, the condition being that he should be permitted to share in the purchase, which was not agreed to. If he believed, as may well be supposed he did, that the steamer had been sold for less than her value, he might willingly acquiesce in the sale, provided he could participate in the purchase, and still he might be very unwilling to acquiesce when other persons were to enjoy the benefit of it to his exclusion.

On the 2d of March 1854, Montgomery's counsel gave Whittington the following notice:

"Sir: Make no title to any one for the steamer Jewess. Mr. Montgomery will treat the sale as a nullity, and any effort to turn it into a reality will be resisted. Of course anything done by you adverse to his wishes must be at your peril."

The bill was filed on the 14th of April 1854, and in May following the steamer was sold by Ricketts and Whittington. Subsequently she was lost at sea. A decree for a re-sale would therefore afford no relief to the complainant, and the court below did right in passing a decree in his favor for his proportion of the value of the vessel.

The decree estimates her whole value at $30,000, subject to certain deductions for repairs and debts.

The grounds on which this estimate is based have been fully examined, and, by a majority of the judges sitting in this cause, the proof is deemed sufficient to justify the estimate in such a case. The authorities on this subject sustain the proposition that, in cases similar to the present, when the property is lost or so disposed of, in consequence of the conduct of a trustee,

Ricketts & Whittington *vs.* Montgomery.

that it cannot be returned or put in a condition to be re-sold, the *cestui qui trust* is entitled *to the full value* of the property at the time of the sale by the trustee.

In *Ringgold vs. Ringgold*, 1 *H. & G.*, 70, it is recognized as a correct principle, that the trustee should be charged with the utmost value of the property, when there is no possible means by which the court can reinstate the complainants in their interest. The court say: "This is the principle adopted in the case of a mixture or confusion of property, and the ground of it is, that although the trustee may be injured by its application, yet the *cestui que trusts* are certain of indemnity; and it would be but just, that if, in the impossibility growing out of the conduct of the trustee of ascertaining the actual value, injury should probably result, it should rather fall on him whose conduct had been delinquent, than on the innocent *cestui qui trusts*. Yet, *when the value of the property can be clearly ascertained, that must be the indemnity.*"

It cannot, with any propriety, be said in this case, that the value of the steamer can be *clearly ascertained;* when the proof on the subject is so very conflicting. It is shown, however, that, not long after the 1st of March 1854, she was actually sold for the price of $30,000, by Whittington & Ricketts. It is also in proof that on the 15th of February previous, Mr. Peters bid for her the sum of $27,500.

There are exceptions, in the record, to portions of the evidence, some of which are not very specific; and as the cause was elaborately and ably argued, without reference to those filed on the part of the appellants, we supposed them to have been abandoned. Those filed by the appellee need not be noticed, further, than to say, that whether sustained or overruled they would not vary the decision announced in this opinion.

The decree of the court below will be affirmed, and the cause remanded for the purpose of having that decree carried into effect.

*Decree affirmed and cause remanded.*

(Decided February 24th, 1860,)