## MARYLAND CREDIT FINANCE CORPORATION *v.* HAGERTY

[No. 162, September Term, 1957.]

*Decided March 5, 1958.*

The cause was argued before BRUNE, C. J., and HENDERSON, HAMMOND and PRESCOTT, JJ.

*T. Hughlett Henry, Jr.,* with whom were *Thomas J. Keating, Jr.,* and *Henry, Henry & Adkins* on the brief, for appellant.

No brief and no appearance for appellee.

HAMMOND, J., delivered the opinion of the Court.

We must decide whether a branch manager of an automobile finance company, whose employment terminated during the year, forfeited his right to a bonus payable after the end of the year because he breached his duties and obligations to his employer.

Maryland Credit Finance Corporation is engaged in financing automobile sales, both wholesale and retail, through various branch offices in Pennsylvania, New Jersey, Delaware and Maryland. In the retail financing, Maryland purchases conditional sales contracts between the dealer and the customer, wherein title to the vehicle is reserved to the dealer, and assigned to Maryland. In the wholesale financ-

ing, or "floor planning", the dealer delivers notes in the amounts advanced by Maryland towards the price paid to the manufacturer by the dealer and retains the car on the showroom floor under trust receipts. A maximum is established as to the amount that may be advanced to each dealer. The dealer must pay off Maryland's note when the car is delivered to the customer.

In 1949, Hagerty, the appellee, was promoted to manager of Maryland's Wilmington, Delaware, branch where he dealt with some twenty automobile dealers in parts of Pennsylvania, New Jersey, Delaware, and Cecil County, Maryland. Hagerty had full charge of the branch, with the power to hire and fire subordinates. He had direct responsibility for the purchase of conditional sales contracts in the retail financing operations and the duty of approving the terms and amounts of each contract, after taking into account the credit standing of the dealer and the customer and the amount of the down payment. When he approved a contract, he purchased it from the dealer and forwarded it, with the title certificate for the automobile, to the home office. Thereafter, he was called on to collect, or attempt to collect, the monthly installments due by the customer and, if necessary, to repossess the automobiles.

Hagerty's duties, in regard to the wholesale financing, included regular and periodic checks of the dealers to see that none exceeded the maximum limitation on advances, the determining whether any automobile was "out of trust", that is, to make sure that a car was not delivered to a customer until the dealer had paid Maryland its advance against the car, and a continual survey of the financial status of the dealers.

Through wholly-owned subsidiary corporations, Maryland engaged in the insurance business. The branch managers sold this insurance and were required to collect all premiums. If the premium was not collected within thirty days, they could, and were supposed to, cancel the policy. If cancellation were made late, Maryland was required to pay the premium even if it had not been collected from the customer.

Hagerty was employed under a customary oral contract

terminable at will by both the employer and the employee. The agreement was for a fixed monthly salary, paid twice a month, plus an annual bonus payable in January of each year in an amount equivalent to 20% of the Wilmington branch's annual net profit for the preceding year. It was testified that as was generally so in the finance business, such bonuses were payable only to those in the employ of Maryland at the end of the year. It was shown that if a manager left the employ of one company to go to another, it was customary for the new employer to agree to pay the bonus that the employee would have gotten from his old employer had he remained.

Between May, 1951, and November 16, 1951, when Hagerty's employment was terminated, Maryland advanced him eleven payments of $50.00 each and one of $100.00, totalling $650.00, because he complained of the increased cost of living. These payments were to be credited against any bonus to which he might have been entitled for 1951.

During the late spring or early summer of 1951, Maryland's officers began to notice that delinquencies and repossessions were running abnormally high at the Wilmington branch, that contracts and automobile titles were not being forwarded within the proper time, and that Hagerty was not filing reports or answering home office correspondence. Maryland made unsuccessful efforts to have Hagerty correct these deficiencies. Finally, in October, 1951, Maryland's executive vice-president assumed general supervision of the Wilmington branch. On November 16, 1951, Maryland's president and its executive vice-president met with Hagerty and told him that they must insist on correction of unsatisfactory conditions. One requirement was that Hagerty dismiss his wife as office manager and another was that a home office crew be placed in the branch until its operations were back on a sound footing. After some discussion, Hagerty agreed to dismiss his wife but he refused to accept the home office crew, since this, in effect, would take the responsibility for the management of the branch from him. Hagerty asked if he would receive his bonus if he resigned, and the president promised him that when the bonus was payable the company

would pay him "any commission or bonus to which he was then entitled." Hagerty then resigned. Although he testified that he did not know he would have to be in the employ of the company when the bonus was payable, to be entitled to receive it, three days later he called to ask if he could be reemployed because, he said, he was fearful in his own mind of not receiving his bonus if he was not Maryland's employee at the end of the year. Maryland would not reemploy him and he secured employment with another finance company, where he was working at the time of the trial.

After Hagerty's resignation, but before the end of 1951, Maryland learned for the first time that earlier in that year he had entered into partnership with J. Ewing Lort (who did business as Elkton Motor Sales), from whom Maryland's Wilmington branch purchased conditional sales contracts and whom it financed under a floor plan. Hagerty had agreed to supervise the automobile business and to oversee the activities of one Lennon, whom he had produced to operate the partnership while Lort was ill. Hagerty, Lort and Lennon were each to receive one-third of the monthly profits. Hagerty devoted several days a week to supervising Elkton Motor Sales during the months of July and August, 1951, and perhaps in June and September also. He received several hundred dollars and an undated promissory note for $400.00 as his share of the profits. During the time that Hagerty was in partnership with Lort, the Wilmington branch's purchases of contracts from Lort rose sharply, although such an increase in business was abnormal for that time of year, and Lort was allowed to exceed his floor plan wholesale financing limitation. In the fall of 1951, Hagerty severed his connection with Lort because he felt Lort and Lennon were adopting unwise practices and that the business was financially unsound. Maryland knew nothing of Hagerty's relations with Lort until after November, 1951. The trial court found that Maryland had lost some $1,000 on Elkton Motor Sales contracts and that Hagerty was directly responsible for 25% of this loss.

After November 16, 1951, Maryland made another discovery. It found out that in the summer of that year Hagerty

had borrowed $1,500.00 from Franklin T. Williams, Jr., (who traded as Williams Motor Company, of Elkton), an automobile dealer from whom Maryland was purchasing conditional contracts of sales and who had purchased insurance from Maryland's subsidiaries. The loan was payable on demand, with interest.

During the summer and fall of 1951, Elkton Motor Sales and the Williams Motor Company were among Maryland's worst accounts with respect to delinquencies, repossessions and missing title certificates, and Williams was, by far, the largest debtor in the list of overdue insurance accounts.

The trial court found that the Wilmington branch had a net profit of $18,655.00 for the year 1951 although it suffered a net loss in each of the months of October, November and December and there were an unusual number of repossessions in December. Hagerty's successor attempted to clean up the situation. Despite these efforts, the branch was required to charge off $12,500.00 in losses in 1952. In January, 1952 Hagerty wrote Maryland, demanding his 1951 bonus. His demand was ignored and in April he filed suit. The trial judge limited recovery to a maximum of 10½-12ths of the net profit for 1951, or $3,264.00, and against this charged various advances and losses, finding a balance due of $1,128.50, for which Hagerty was given judgment. Maryland appealed. Hagerty did not cross appeal or make any appearance or argument in this Court.

Maryland contends that the contract of employment provided for a non-severable or non-apportionable bonus payable to Hagerty only if he was in the company's employ at the end of the year 1951 and that he gave up his right to any part of such bonus when he voluntarily quit his job during the year, and, in the alternative, that Hagerty's dealings with Lort and Williams created a conflict of interest that constituted wilful, material and deliberate breaches of his duty of loyalty and good faith to Maryland, and that these breaches prevent recovery of any part of the bonus, regardless of whether they caused Maryland demonstrable loss.

We think that Maryland may not prevail on its first contention. We may assume, without deciding, that the general

principle argued for is the law but if this be done, it is beyond argument that the trial judge was correct in his finding of fact that Hagerty's resignation was on the express agreement by Maryland that he would be paid his bonus. The making of this agreement could not be remembered, but was not denied, by the executive vice-president, but was admitted by the president. We think it would preclude Maryland from withholding the bonus if there had been no breach of duty by Hagerty.

The decisive question is whether Maryland is correct in the second contention. We think that it is. It is an elementary principle that fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest. The rule was well stated in *De Crette v. Mohler*, 147 Md. 108, 115: "Experience has taught us that no man can serve two masters, and for this reason it has long been an established rule of law that an agent cannot recover from his principal in any transaction in which the agent's interest was antagonistic to that of the principal, unless such interest was fully and fairly disclosed to the principal. * * * In accordance with this rule it has been held that, without full disclosure, an agent cannot buy from, or sell to, his principal, that he cannot represent two principals having antagonistic interests, and that he cannot make a secret profit out of any transaction with its principal. * * * The foregoing rule is applied whether or not the interest or profit of the agent causes any loss to the principal." In 4 *Williston, Contracts,* Rev. Ed., Sec. 1022, the learned author says: "The duty of fidelity to his employment imposes on the employee not simply the positive duty of reasonably skillful performance of the work intrusted to him, but the negative duty of refraining from deception and from entering into relations giving him an interest inconsistent with that of the employer. Thus, deceptive and fraudulent statements or conduct not only renders the employee liable, but justifies his discharge. Generally such conduct involves damage to the employer but it may be ground for discharge, though no damage is involved. * * * The employee's duty of fidelity forbids

him, if his duty is to buy property for his principal, to furnish his own property or that in which he has an interest without disclosing the fact. * * * An employee who violates these fundamental duties of loyalty cannot recover even for the services he has rendered." See *Ritterpusch v. Lithographic Plate,* 208 Md. 592; *Adams Express Co. v. Trego,* 35 Md. 47; *Ricketts v. Montgomery,* 15 Md. 46; *Restatement, Agency,* Secs. 387, 389, 391.

The first two cases just cited make it clear that the duty of loyalty and of avoiding conflicting interests are as applicable to a servant of a corporation whose managerial duties are as extensive and important as those of Hagerty as to any other agent. See also *Restatement, Agency,* Sec. 429; *Cumberland Coal & Iron Co. v. Parish,* 42 Md. 598, 605; *Acker, Merrall & C. Co. v. McGaw,* 106 Md. 536, 556-558.

It is plain that the relationships entered into by Hagerty with Lort and Williams were such as to put him in the position of having to serve two masters. He became directly interested as a profit-sharing partner in the financial success of Lort's business. At the same time, on Maryland's behalf, he had the obligation to scrutinize with care Lort's contracts of sale and to check on his wholesale financing. He was buying for his employer, Maryland, automobile paper in which he had an interest and, so, directly violating a duty. By borrowing money payable on demand from Williams, he made it completely untenable for him to exercise with respect to Williams' paper and insurance the independent judgment his duty as Maryland's manager required, or to police credit standing or delinquencies. Significant is it that during the time Hagerty was a partner in the business that Lort exceeded his wholesale financing limits and Maryland's purchases of paper from him increased sharply and contra-seasonally, as it is that, with the exception of Lort, Williams was the Wilmington branch's worst account with respect to repossessions and missing certificates of title, and was the largest debtor of delinquent insurance premiums, while Hagerty owed him $1,500.00

The president of Maryland, who had spent many years in the finance business for Maryland and for other companies,

testified that Hagerty's conduct with Lort and Williams would be absolutely prohibited as unethical, disloyal and unfaithful by every finance company, and would be grounds for immediate discharge. At the time of the trial, Hagerty had worked for finance companies for ten years. He made no effort to dispute or belittle this testimony but let it stand uncontradicted.

We think that if Maryland had known in November, 1951, what it found out shortly thereafter, as to Hagerty's conduct with Lort and Williams, it would have been justified in summarily dismissing him from its employ and that this justifiable discharge would have relieved it of the obligation to pay his bonus at the end of the year when it otherwise would have become payable. We think the record leaves no room for any finding except that the bonus was not to be apportioned and that the right to its receipt was to depend upon the employee being in the service of the company at the end of the year.

Where the breach of duty by the employee was wilful and material, as we find it to have been in the case before us, the Courts have held consistently that the employee has forfeited at least compensation which has not already been earned. The rule was recognized, although found inapplicable on the facts, in *Shipley v. Meadowbrook Club,* 211 Md. 142, 148. It was there said that: "We accept the general principle that an agent who is guilty of fraud upon his principal, particularly where there is a conflicting interest, concealment, or a wilful and deliberate breach of his contract, may be denied compensation for his services." See *Swaney v. Clark-Wilcox Co.* (Mass.), 120 N. E. 2d 281; *National Manufacture & Stores Corp. v. Whitman* (4th Cir. 1938), 93 F. 2d 829; *Lamdin v. Broadway Surface Advertising Corp.* (N. Y.), 5 N. E. 2d 66; *Ocean Forest Co. v. Woodside* (S. C.), 192 S. E. 413; *Restatement, Agency,* Secs. 399(k), 456, 469; 5 *Williston, Contracts,* Rev. Ed., Sec. 1477. The rule was found applicable in *Adams Express Co. v. Trego, supra,* and in *Bright v. Ganas,* 171 Md. 493, 504. Compare *Schneider v. Brewing Co.,* 136 Md. 151, 154. In *Baer v. Robbins,* 117 Md. 213, relied on below by the appellee, the

refusal of the court to apply the principle would seem to have been on the finding that the breach of duty was more apparent than real, and this was explicitly found to be so in *Lewis v. Fisher*, 174 Md. 41, 46, in allowing compensation to the agents.

We think that the trial court was clearly wrong in deciding that Hagerty's conduct did not constitute disloyalty or bad faith and that because no actual loss was demonstrated, his right of recovery was not prejudiced. We find the record to demonstrate that his conduct was wilfully and materially disloyal to and in conflict with the interests of his employer, and that it caused him to forfeit his right to the unapportionable bonus he otherwise would have been entitled to receive.

*Judgment reversed, with costs.*