723 A.2d 560

**LERNER CORPORATION**

v.

**THREE WINTHROP PROPERTIES, INC.**

No. 651, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Feb. 1, 1999.

Julie B. Rottenberg (Stephen M. Sacks, George E. Covucci, Arnold & Porter, Washington, DC, Albert D. Brault, Rhonda A. Hurwitz and Brault, Graham, Scott & Brault, Rockville, on the brief), for appellant.

John J. Tumilty (Barbara L. Moore, Edwards, & Angell, LLP, Boston, MA, Seth D. Greenstein and McDermott, Will & Emery, Washington, DC, on the brief), for appellee.

Argued before MOYLAN, WENNER and EYLER, JJ.

EYLER, Judge.

This case concerns the interpretation of a management and leasing agreement dated January 16, 1985 (the Agreement) between Lerner Corporation, appellant, the exclusive leasing and management agent for the Springhill Lake Apartments located in Greenbelt, Maryland, and Three Winthrop Properties, Inc., appellee, the agent of the owners of the apartments.[1]

---

1. Springhill Lake Apartments is owned by ten limited partnerships. The general partner of each limited partnership is Springhill Lake

The section of the Agreement in dispute is 14(b), which provides as follows:

Owner shall have the right, without liability and without cause to terminate at any time from and after the last day of the calendar month in which occurs the tenth (10th) anniversary of the date of this Agreement by giving Agent written notice of its election to do so. Such notice shall specify the effective date of such termination (which shall be a "Termination Date"), which date shall be not earlier than 90 days after such notice is given.

The parties agree that January 31, 1995 was "the last day of the calendar month in which occurs the tenth (10th) anniversary of the date of this Agreement." On October 17, 1994, appellee gave written notice to appellant, in which it stated its intent to terminate the Agreement effective January 31, 1995. Appellant responded that the notice could not be given until January 31, 1995, and would not be effective until 90 days thereafter. Appellant further stated that it would continue as leasing and management agent until that time.

On November 18, 1994, appellee filed suit in the Circuit Court for Montgomery County. In Count One, appellee sought a declaration of the rights of the parties and specifically an interpretation of § 14(b). In Count Two, appellee sought damages for breach of contract in anticipation of appellant's failure to honor the asserted termination of the contract on January 31, 1995. Appellee filed a motion for partial summary judgment with respect to Count One, and on February 14, 1995, the circuit court granted it. In doing so, the circuit court ruled that the Agreement terminated on January 31, 1995. Appellant appealed to this Court, but in January 1996, this Court dismissed the appeal because of the lack of a final appealable judgment.

On October 10, 1997, appellee filed a motion for partial summary judgment with respect to Count Two, seeking dam-

Investors Limited Partnership. Appellee is the managing general partner of Springhill Lake Investors Limited Partnership.

ages for appellant's management of the apartments for a three month period after January 31, 1995. During the three month period, appellant continued to manage the apartments pursuant to its interpretation of the Agreement, despite the circuit court's February 14, 1995 ruling on appellee's motion for partial summary judgment. On November 20, 1997, the circuit court granted appellee's motion for partial summary judgment on Count Two and awarded appellee all the management fees received by appellant for the three month period in question, which totaled $226,954. After the circuit court entered an order disposing of the question of attorney's fees,[2] the last open issue in the case, appellant noted this appeal.

### Questions Presented and Contentions of Parties

Appellant presents four separate questions, but the essence can be restated as follows:

1. Is the relevant language in the Agreement clear and unambiguous and was the circuit court's decision legally correct?

2. On the issue of damages, was a judgment for the full amount of the management fees legally correct?

With respect to the first question, appellant argues that the language in the Agreement was, at a minimum, ambiguous, thus making summary judgment improper. Appellant relies on (1) the plain language in the Agreement; (2) the language considered in context; and (3) appellee's interpretation of the Agreement contained in public documents prepared by appellee prior to the recent controversy between the parties. With respect to appellee's publicly stated interpretation, appellant argues that (1) it is relevant to the interpretation of the Agreement and (2) it forms the basis for equitable estoppel.

With respect to the second question, appellant asserts that, even if appellee's interpretation is correct, appellee is not entitled as a matter of law to all management fees received by appellant during the three month period in question. Appel-

---

2. The question of attorney's fees is not an issue on appeal.

lant argues that Count Two sounded in breach of contract and the measure of damages is that amount of compensation which would place appellee in the position in which it would have been if appellant had relinquished its duties on. January 31, 1995. Appellant argues that another management company would have been paid a fee during the three month period and that the amount of damages should have been the difference between appellant's fees and what appellee would have paid to another management company, if less than appellant's fees. Appellant also argues that damages in the full amount of the management fees cannot be justified on a theory of unjust enrichment.

With respect to the first question, appellee asserts that the language in the Agreement is unambiguous and, when considered in context, calls for a reasonable result. Appellee argues that the Agreement was for a ten-year term and that appellee had the right to terminate the Agreement as of January 31, 1995; it did not have merely the right to give notice as of that date. Appellee also asserts that there are no prior inconsistent statements relating to its interpretation of the Agreement and that any such statements are irrelevant in any event. With respect to appellant's estoppel argument, appellee states that the prior statements were not directed to appellant, and appellant did not rely on such statements.

On the issue of damages, appellee asserts that appellant had no contractual right to management fees once the contract had been terminated and that appellant took fees from the rental proceeds without authorization. Appellee also points out that appellant did not file a counterclaim seeking payment, but even if the filing was unnecessary, appellant would not be entitled to compensation under theories of unjust enrichment or *quantum meruit*, because its services were unwanted and had been rendered gratuitously.

### Discussion

#### I.  Contract Interpretation

The construction of contractual language is, in the first instance, "a question of law for the court to resolve."

*Shapiro v. Massengill,* 105 Md.App. 743, 754, 661 A.2d 202
(1995). A contract is not ambiguous merely because the
parties disagree as to its interpretation. *Fultz v. Shaffer,* 111
Md.App. 278, 299, 681 A.2d 568 (1996). Rather, if the disputed
term "is clear as to its meaning, there is no room for construc-
tion and it must be presumed that the parties meant what
they expressed." *Fultz,* 111 Md.App. at 298, 681 A.2d 568;
*Feick v. Thrutchley,* 322 Md. 111, 114, 586 A.2d 3 (1991);
*Kasten Constr. v. Rod Enters.,* 268 Md. 318, 328, 301 A.2d 12
(1973). We shall review the circuit court's conclusions on
partial summary judgment to determine whether they were
legally correct. *See Heat & Power Corp. v. Air Prods. &
Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990); *IA
Constr. Corp. v. Carney,* 104 Md.App. 378, 384, 656 A.2d 369
(1995), *aff'd,* 341 Md. 703, 672 A.2d 650 (1996).

■ With respect to the first issue, we agree with the
circuit court that the disputed contract provision is unambigu-
ous and susceptible of only one meaning. There is no dispute
that the provision specifies a target date for the earliest
occurrence of either termination or notice of termination—
January 31, 1995. The parties dispute whether termination or
only notice of termination can occur on that date. Section
14(b) grants to the Owner the power "to terminate" the
Agreement on this target date "by giving Agent written notice
of its election to do so." This power to terminate may be
exercised "at any time from and after" the target date. The
concluding phrase of this sentence merely provides for ad-
vance notice of the intended action. Thus, the subject of the
sentence, termination, is modified by two succeeding phrases,
the first specifying the timing of termination, and the second
providing for advance notice of that termination. Appellant
would, in effect, have us rewrite the first sentence of subsec-
tion (b) so that notice is its subject. Plainly, it is not.

The Agreement also indicates in several places that it was
for a specific "term" subject to renewal. Section 2 of the
Agreement provides that the managing agent, appellant, is
retained for the "term" specified in § 14. In § 12 of the

Agreement, dealing with the managing agent's compensation, it provides that the managing agent is entitled to 4% of the gross rentals received for each month "throughout the term of this Agreement." Additionally, section 14(e) provides that, in the event that either of the parties should elect to terminate the Agreement pursuant to subsections (b), (c), (d), or § 14.A,[3] "this Agreement shall terminate on the Termination Date with the same force and effect as if the Termination Date were the same date set forth in subsection (a) for the expiration of the term hereof." Subsection 14(a) therefore contains the natural term of the agreement, which may be modified according to other provisions.

Subsection (a) provides:

This Agreement shall be in effect from and after the date hereof until the expiration of the last day of the calendar year which completes 10 full calendar years after the date hereof, and shall, without further action by Owner or Agent, be automatically renewed for successive one year terms, on the same terms and conditions as set forth in this Agreement provided, however, that this Agreement is subject to termination at any time pursuant to, and on the conditions set forth in this Section and Section 14.A.

Though providing for a term based on calendar years rather than calendar months, subsection (a), in defining the natural effective term of the Agreement, uses language remarkably similar to the language in subsection (b) pertaining to termi-

---

**3.** Subsection (c) provides that appellant shall have the right without cause to terminate the Agreement at any time by giving appellee written notice of its election to do so. It further provides that "[s]uch notice shall specify the effective date of such termination (which shall be a 'Termination Date'), which date shall not be earlier than 90 days after such notice is given."

Subsection (d) provides that appellee shall have the right to terminate the Agreement, effective upon the closing date of a sale of the project or of 90% of the ownership interest in the owner, provided that the owner gives at least 90 days notice to appellant of the sale, and further provided that upon the Termination Date, owner shall pay to appellant a termination fee computed as set forth in that subsection.

Paragraph 14.A provides the remedies for each party upon default by the other party.

nation. The beginning structure of the paragraphs is the same in that the respective subjects are named first, and are followed by a description of the method for computing when those subjects are triggered. This similarity in the drafting of subsections (a) and (b) also supports the circuit court's conclusion that the target date of subsection (b) describes the end of the term rather than the date on which notice may be given.

The alleged inconsistent statements on which appellant relies are statements contained in an offering memorandum dated January 16, 1985, directed to potential investors and in a Form 10–K filed with the U.S. Securities & Exchange Commission on March 31, 1994. The language of these documents is substantially the same. The offering memorandum provides:

> The Management Agreement may not be terminated by the Investor Partnership without cause for 10 years from the date of the agreement. Thereafter, termination by the Investor Partnership is permitted upon 90 days notice.

The statements contained in these documents are not inconsistent with the position taken by appellee in this case. Like § 14(b), the documents are silent as to when notice is to be given vis-a-vis the end of the term, but state unequivocally that the Agreement may not be terminated until the expiration of a specified term. Accordingly, the circuit court did not err in declaring the disputed provision unambiguous and in declaring that appellee's notice of termination was properly tendered.

## II. Damages

By the express language of the management Agreement, appellant, named "Agent" for purposes of the Agreement, was under a fiduciary duty with respect to its management of the property for appellee. Section 4(r) of the Agreement provides:

> Agent shall otherwise manage and operate the Project in the best interests of Owner in accordance with this Agree-

ment and act as a fiduciary to Owner in protecting and accounting for Owner's assets and property.

Section 7 of the Agreement details the status and handling of a "Rental Agency Account," out of which appellant was authorized to pay itself for services rendered, subject to restrictions in the Agreement. Section 7 provides in part,

> All monies received by Agent for or on behalf of Owner shall be deposited in an account or accounts (collectively, the "Rental Agency Account") to be maintained by Agent in American Security Bank, N.A., Washington, D.C., or in one or more other commercial banks which may be designated by Owner. Agent shall pay from the Rental Agency Account all sums due and payable by the Owner as an expense of the Project and the Management fee to itself. . . . All funds held by Agent for Owner's account shall be trust funds in the hands of Agent.

Under the Agreement, appellee gave appellant sufficient information and power to exercise control over the Rental Agency Account and authorization to pay itself out of the account, but charged appellant with managing the property in appellee's best interests and "protecting and accounting for" appellee's assets.

The record demonstrates that appellant breached the Agreement and its fiduciary duty by refusing to abide by the notice of termination and, more important, by exploiting its previous position and access to confidential information in continuing to pay itself unauthorized compensation after the Agreement had terminated. We conclude that appellant's actions after the Agreement had terminated were not only unauthorized by appellee but inconsistent with a standing court order construing the termination date in favor of appellee and declaring that notice of termination was properly given. Even prior to an order by the court, appellant's fiduciary duty required it to refrain from using its previous contract position and confidential information to withdraw disputed assets. Appellant was free to assert any claims it might have had to those assets at a later time. Appellant's

actions after the Agreement was terminated were adverse to the interests of its former principal and contrary to obligations that survived the termination of the Agreement. In other words, appellant improperly gambled that its interpretation of the Agreement would prevail. Appellant's actions thus form a basis for forfeiture of the entire sum it obtained after termination.

In the context of a sale of property by a fiduciary, the Court of Appeals has said, "It is a confidence necessarily reposed in the agent, that he will act with a sole regard to the interest of the principal as far as he lawfully may." *Raisin v. Clark*, 41 Md. 158, 159–60 (1874). In *Raisin*, the appellant, a real estate broker employed by Cooper, arranged for an exchange of property between Cooper and Clark, the appellee, and thereafter attempted to collect a commission from both Cooper and Clark for the exchange. *Raisin*, 41 Md. at 159. The Court of Appeals denied the appellant his requested commission, concluding that "the law will not permit an agent of the vendor whilst that employment continues, to assume the essentially inconsistent and repugnant relation of agent for the purchaser." *Id.* at 160. For taking essentially inconsistent positions in the transaction before it was consummated, the Court refused to grant appellant any additional commission. A similar breach of duty was alleged in *Hardy v. Davis*, 223 Md. 229, 164 A.2d 281 (1960), in which the appellee, a real estate broker, arranged for the sale of appellants' property but, after the contract of sale had been signed, made loans to the buyers in part to assist them with settlement expenses. *See Hardy*, 223 Md. at 231, 164 A.2d 281. The sales contract was never fully performed, and the sellers sued their former agent for his failure to disclose the fact that he had made loans to the buyers. *Id.* at 232, 164 A.2d 281. After stating the general rule that prohibits a broker from acting lawfully for both vendor and vendee during the term of the agency, the Court stated that the rule has no application after the agency has terminated, whereupon, "the agent is free to act for himself or the opposing party as long as he does not hinder, delay or interfere with the sale which has been entered into by the

seller and the purchaser." *Id.* at 233–34, 164 A.2d 281. The Court concluded that the agency had terminated when the contract was signed, and that the loans were proper and had actually facilitated the sale. *Id.* at 234, 164 A.2d 281.

The Court noted that in addition to a duty not to "hinder, delay or interfere" with the transaction after termination of the agency, an agent has a continuing duty "not to take advantage of a still subsisting confidential relationship created during the prior agency relation or acknowledged thereafter." *Id.* at 233 n. 1, 164 A.2d 281. The Court cited the Restatement (Second) of Agency, § 396 for the above proposition. That section provides in part:

> Unless otherwise agreed, after the termination of the agency, the agent:
>
> . . .
>
> (d) has a duty to the principal not to take advantage of a still subsisting confidential relation created during the prior agency relation.

Restatement (Second) of Agency, § 396 (1958). Comment *j* to this section provides some examples of this duty:

> [O]ne who employs an attorney become[s] entitled to regard the attorney as one to whom information can be given freely and as one who will not use for his own advantage or that of others information thus given . . . .
>
> Where there is a misuse of the confidence reposed by a person in such a confidential relation, an action of tort or for restitution lies.

Section 399(d) of the Restatement (Second) of Agency explicitly recognizes the remedy of restitution, and in comment d refers to analogous provisions of the Restatement of Restitution that pertain to an agent's improper claim to a principal's property.

Among those provisions of the Restatement of Restitution, section 200, entitled "Using Confidential Information," is most pertinent here:

Where a fiduciary in violation of his duty to the beneficiary acquires property through the use of confidential information, he holds the property so acquired upon a constructive trust for the beneficiary.

Restatement of Restitution, § 200 (1937). Comment a to that section provides,

A fiduciary is subject to a duty to the beneficiary not to use on his own account information confidentially given him by the beneficiary or acquired by him during the course of or on account of the fiduciary relation or in violation of his duties as fiduciary, in competition with or to the injury of the beneficiary....

He is under such a duty even after the termination of the relationship....

■ Thus, full restitution is an available remedy for a breach of contract that is also violative of those fiduciary duties that extend beyond termination of the relationship, such as the duty not to use confidential information. *See also* E. Allan Farnsworth, 3 *Farnsworth on Contracts*, § 12.20a, pp. 356–57 (2nd ed.1998). We view the above provisions as highly instructive in the present situation and supportive of the restitutionary remedy granted by the trial court. Appellant used information and the control over appellees' property obtained through its agency relationship to collect monies from which it paid itself.

Maryland has recognized the restitutionary remedy of disgorgement of an agent's prospective compensation when the agent breaches a fiduciary duty owed to the principal during the existence of the relationship. In *Maryland Credit v. Hagerty*, 216 Md. 83, 139 A.2d 230 (1958), the Court of Appeals stated: "It is an elementary principle that fundamental duties of an agent are loyalty to the interest of his principal and the need to avoid any conflict between that interest and his own self-interest." *Maryland Credit*, 216 Md. at 90, 139 A.2d 230. The Court held that Hagerty, the agent in that case, had breached these duties by forming a partnership with customers of a branch wholesale financing operation that

Hagerty operated for Maryland Credit. *Id.* at 86–88, 139 A.2d 230. The Court denied Hagerty's claim to an end-of-year bonus for the year during which he was terminated. *Id.* at 93, 139 A.2d 230. The Court stated: "Where the breach of duty by the employee was wilful and material, as we find it to have been in the case before us, the Courts have held consistently that the employee has forfeited at least compensation which has not already been earned." *Id.* at 92, 139 A.2d 230.

Restitution also has been applied as a remedy for breaches of fiduciary duties in other Maryland decisions and in the decisions of other jurisdictions.[4] *See, e.g., McGinnis v. Rogers,* 262 Md. 710, 731–32, 279 A.2d 459 (1971); *Sellner v. Moore,* 251 Md. 391, 399, 247 A.2d 523 (1968); *Homa v. Friendly Mobile Manor,* 93 Md.App. 337, 352, 612 A.2d 322 (1992); *Snepp v. United States,* 444 U.S. 507, 515–16, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980) (per curiam); *Lawson v. Baltimore Paint and Chem. Corp.,* 347 F.Supp. 967, 977 (D.Md.1972). *But see Fairfax Savings v. Weinberg & Green,* 112 Md.App. 587, 627–28, 685 A.2d 1189 (1996) (concluding that disgorgement of all fees is not an appropriate remedy for overbilling of client by law firm). It is a small step beyond existing precedents to recognize a restitutionary remedy for a breach of a fiduciary duty that persists beyond the official, albeit disputed, termination of the relationship.

■ Appellant has raised a question whether the circuit court's ruling was consistent with the above analysis or whether it was decided on some other basis that would require remand. Though appellee has consistently requested full restitution for appellant's actions, it has cast its argument at times in tort as well as in contract. In its motion for partial summary judgment as to count two of the complaint, argued on November 20, 1997, appellee asserted for the first time that

---

4. Maryland law does not recognize an independent, omnibus cause of action in tort for breach of fiduciary duty. *Kann v. Kann,* 344 Md. 689, 713, 690 A.2d 509 (1997). The restitutionary remedy that we apply in the present case creates no new cause of action for a breach of fiduciary duty.

appellant had committed the tort of conversion by paying itself the value of three months of management fees. Appellant responded as follows:

> [COUNSEL FOR LERNER]: I also want to point out something about their conversion argument. It is the first time we have seen it. We have seen it on the reply brief. It is not appropriate to be raising an argument to justify summary judgment the first time in a reply brief.
>
> And there is not one word about conversion anywhere in this complaint, not anywhere. If conversion is—in the cases they themselves cite—is an independent tort, then they should have alleged an independent tort.

The circuit court did not thereafter mention conversion in ruling on the motion:

> THE COURT: I understand. All right. I am going to grant the motion for partial summary judgment as to Count Two. The reason I am going to do it is this. If I do not grant this motion, it makes the grant of the Count One motion a nullity. They got something that the court intended them to get, and it is just useless.
>
> And it makes good common sense when you think about it, what should Lerner have done. Lerner was—they had a decision from a court that they did not agree with, and they said they should be able to stay there three more months, but it really almost looks like an injunction—injunctive type relief.
>
> What they had to do was they could have gotten out and then pursued their claim because the amounts of money that they would have made could have been proven up by seeing what Winthrop Management or whatever other management company did it, all they had to do was sit back and if they were right, they were going to make the money—the profit that they would have made anyway.
>
> But instead, they decided to stay in there, and I think that was a risk they took, and it turned out to be to their detriment. I am going to grant the motion for partial summary judgment ... on Count Two.

The ruling on Count Two refers to the disposition of Count One, and the ruling is framed as an effectuation of the court's earlier interpretation of the Agreement. Appellee's request is essentially restitutionary in nature, and it is apparent that the court did not rely on the existence of an underlying tort to ground its award to appellee of all post-termination funds. We interpret the ruling of the court as a grant of restitution for appellant's breach of contract.

Appellant refused to abide by appellee's notice of termination, which was declared to be proper notice under the Agreement by ruling of the trial court. Appellee's actions during the disputed three months reveal active attempts by it to force appellant to end its management functions.[5] By appellant's wilful and material breach of its duties to recognize the termination of the relationship and to refrain from using its former powers and confidences to the detriment of its former principal, it forfeited any prospective payments that it otherwise might have claimed. Appellant took a "risk" that was not only unsupported by what we have held to be the proper interpretation of the Agreement, but was inconsistent with its continuing fiduciary duties under that Agreement. It follows from our holding that restitution was appropriate that there is no valid basis for appellant's alternate theory of unjust enrichment. We therefore affirm the decision of the trial court as to Count Two.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

5. With respect to a lessor's action to reacquire possession of commercially leased premises through self-help, the Court of Appeals has stated, "We do not encourage resort to self-help and . . . the Bar usually counsels against it." *K & K Management v. Lee*, 316 Md. 137, 178, 557 A.2d 965 (1989). Appellee was within its rights in not employing efforts of self-help and in attempting instead to enforce its claims in court.